Kristine J. Beal
Ian P. Gillespie
**BEAL LAW FIRM, PLLC**
121 Hickory St., Suite 4
P.O. Box 8898
Missoula, MT 59807-8898
(406) 728-2911
Email:    kbeal@beallawfirm.com
                 igillespie@beallawfirm.com

Attorneys for The Cincinnati Insurance Company

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY, | Civil Action No. ____ |
| Plaintiff, | |
| v. | |
| NORTHWEST PAINTING, INC. dba NORTHWEST FACTORY FINISHES | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| Defendant. | |

COMES NOW Plaintiff The Cincinnati Insurance Company, by and through its counsel of record, Kristine J. Beal and Ian P. Gillespie of Beal Law Firm, PLLC, and for its Complaint for Declaratory Judgment hereby respectfully states and alleges the following:

### PARTIES

1.    The Plaintiff The Cincinnati Insurance Company (hereafter "Cincinnati" and/or "Plaintiff") is now and was at all times material hereto a

corporation duly-organized and existing under the laws of the State of Ohio, with its principal place of business in Fairfield, Ohio.

2.     The Defendant Northwest Painting, Inc. dba Northwest Factory Finishes (hereafter "Northwest" and/or "Defendant") is now and was at all times material hereto a corporation duly-organized and existing under the laws of the State of Montana, with its principal place of business in Bonner, Montana in Missoula County.

## NATURE OF ACTION

3.     This is a complaint for declaratory judgment, pursuant to the Federal Rules of Civil Procedure 57 and 28 U.S.C. § 2201 *et seq*., for the purposes of determining questions of an actual controversy among the parties and construing the rights, duties, and legal relations arising from certain contracts of insurance,  in particular, the commercial general liability policy and the umbrella policy which Cincinnati issued to Northwest.

## JURISDICTION & VENUE

4.     An actual and justiciable controversy exists between Cincinnati and Northwest regarding whether Cincinnati has or will have any duty to defend and/or indemnify Northwest with respect to claims made by numerous property owners alleging that Northwest provided defective siding to their residences or structures.

5.     The United States District Court for the District of Montana has jurisdiction over this matter under diversity jurisdiction, pursuant to 28 U.S.C. § 1332 and Article 3 § 2 of the United States Constitution, which provide that federal courts may hear diversity jurisdiction "between citizens of different

states."

6.      The amount in controversy exceeds the jurisdictional threshold of $75,000 as Northwest has stated that it has already incurred over $100,000 to settle certain property-owner claims.   Northwest  has demanded that Cincinnati indemnify Northwest for these settlements, indemnify Northwest for any future settlements and/or judgments, and pay the cost to defend any lawsuits brought by property owners against Northwest.  Northwest's request that Cincinnati defend any lawsuits brought by property owners through trial would further increase this amount in controversy.   In actions seeking declaratory or injunctive relief, the amount in controversy is measured by the value of the object of the litigation.   *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977).

7.      Venue is proper in the United States District Court for the District of Montana, Missoula Division, pursuant to 28 U.S.C. § 1391, because several events which gave rise to this action occurred in this district, and Northwest has its principle place of business in this district.

## ALLEGATIONS

**A.     Cincinnati's Insurance Policy with Northwest.**

8.      Cincinnati issued Policy No. ENP0127089 to Northwest for coverage terms between February 12, 2018 to February 12, 2021, which provided Commercial General Liability Coverage (hereafter "CGL Coverage") and Umbrella Coverage to Northwest (collectively, "Policy").

//

9.      CGL Coverage provides in relevant part:

**SECTION I - COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against "any" suit seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

<div align="center">***</div>

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

        (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2)    The "bodily injury" or "property damage" occurs during the policy period; and

        (3)    Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, you did not know, per Paragraph **1.d.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

<div align="center">***</div>

//




//

### 2.     Exclusions

This insurance does not apply to:

### j.     Damage to Property

"Property damage" to:

\*\*\*

**(5)**    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)**    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

### k.     Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

### l.     Damage to Your Work

"Property damage" to "your work" arising out of it any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

### m.     Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that

---

**Complaint for Declaratory Judgment**                                                                 **5**

has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

\*\*\*

### n. **Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, costs or expense incurred by you or others for the loss of use, withdrawal, recall,      inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

\*\*\*

## 2. **Duties in the Event of Occurrence, Offense, Claim or Suit**

\*\*\*

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\*\*\*

//

//

## SECTION V - DEFINITIONS

*** 

**11.**    "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    **a.**    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.**    You have failed to fulfill the terms of a contract or agreement;

if such property cannot be restored to use by:

    **a.**    The repair, replacement, adjustment or removal of "your product" or "your work"; or

    **b.**    Your fulfilling the terms of the contract or agreement.

*** 

**16.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*** 

**19.**    "Products-completed operations hazard":

    **a.**    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)**    Products that are still in your physical possession; or

        **(2)**    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)**    When all of the work called for in your contract has been completed; or

            **(b)**    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

---

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

\*\*\*

20. "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\*\*\*

21. "Suit" means a civil proceeding in which money damages because of "bodily injury" "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

**c.** An appeal of a civil proceeding.

\*\*\*

25. "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

---

        **(a)**    You;

        **(b)**    Others trading under your name;

        **(c)**    A person or organization whose business or assets you have acquired; and

    **(2)**    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.**    Includes:

    **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)**    The providing of or failure to provide warnings or instructions.

  **c.**    Does not include vending machines or other property rented to or located for the use of others but not sold.

**26.**    "Your work":

  **a.**    Means:

    **(1)**    Work or operations performed by you or on your behalf; and

    **(2)**    Materials, parts or equipment furnished in connection with such work or operations.

  **b.**    Includes:

    **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)**    The providing of or failure to provide warnings or instructions.

10.    The above-stated provisions in the CGL Coverage are also included in the Umbrella Coverage.

//

**B.     The Property-Owner Claims against Northwest and Collins Products, LLC.**

11.    Northwest is a company based out of Bonner, Montana, which pre-finishes building materials (e.g. siding, trim, shingles, and stone) and then sells the finished materials for installation on residences or other structures.

12.    One of Northwest's suppliers was Collins Products, LLC (hereafter "Collins"), which would sell prefabricated siding to Northwest.  A division of Collins's business is manufacturing several types of siding and trim under the brand name TruWood.

13.    Collins would prime TruWood and send the siding to Northwest for painting and finishing.  After receiving the substrate, Northwest would then be responsible for determining the amount of coating and type of finishing products to be applied to the TruWood substrate.  Northwest markets the finished product (i.e. the TruWood substrate combined with Northwest's finishing) under the brand name TruGuard Siding.

14.    Emails between Northwest and Collins indicate that Northwest discovered performance and quality issues with TruWood in late-2014.  From 2014 to 2017, Northwest and Collins discussed several quality concerns with Collins's TruWood product.  The most salient problem was the lack of primer applied to the boards at the TruWood plant.  This lack of primer required Northwest to apply more paint to ensure that the boards would be sufficiently durable over time.

15.    On or about June 26, 2018, Northwest provided Cincinnati a notice of a "[p]otential" claim.  Northwest's President, Britt Fred (hereafter "Fred"),

submitted the report and stated that this potential claim against Northwest arose from "issues with finishes" regarding the TruWood product and that Fred planned to have "some of the substrate lab tested to identify what the causes of [the] performance issues".   On October 2, 2018, Cincinnati responded to Northwest's June 26, 2018 notice with a reservation of rights letter.  Cincinnati acknowledged receiving notice of the "potential" claim, but gave Northwest notice that the "your product" or "your work" exclusions may bar coverage under the Policy.

16.    Cincinnati later learned, after investigating the claim and obtaining further information from Northwest, that the "potential" claim concerned property owners in Montana, North Dakota, South Dakota, and Idaho who submitted consumer complaints against Northwest which allege that the TruGuard Siding installed on their residences or buildings was defective and was prematurely degrading (hereafter "Property-Owner Claims").   The Property-Owner Claims demanded that the defective TruGuard Siding be replaced or repaired.

17.    The Property-Owner Claims all stem from the same product, Northwest's TruGuard Siding, and make the same or substantively similar allegations that the TruGuard Siding on their residences or buildings has degraded prematurely.  All of the Property-Owner Claims disclosed to date only allege damage to the TruGuard Siding and do not allege any further damage to other parts of their structures or loss of use on other parts of their property.

//

18.    The number of property owners with the allegedly defective siding is unclear at this time.  Northwest has provided documentation that at least 37 property owners who have submitted claims against Northwest and allege a total of $81,000 in damages.

19.    Northwest has communicated that it expects many more property owners to file similar claims concerning the defects in the TruGuard Siding and has stated that these claims continue to "pour in."

20.    Northwest has entered into settlements for some of the Property-Owner Claims and claims to have paid "well over $100,000" in settlements to date.  Cincinnati did not consent to any of Northwest's settlements with the property owners.

21.    Northwest  has taken the position that the Property-Owner Claims stem from Collins failing to pre-prime the substrate.  However, Northwest has also admitted that the Sherwin Williams paint Northwest applies contributed to the defects in the TruGuard Siding.

22.    In April 2020, Cincinnati was informed that one property owner, Michelle Desjarlais (hereafter "Desjarlais"), hired counsel.  Desjarlais lives in Kalispell, Montana.

23.    Desjarlais's counsel has communicated that Desjarlais is prepared  to initiate litigation against Northwest.  On August 28, 2020, Desjarlais submitted an updated complaint to Northwest stating that "a handful of homes...have experienced the same or similar issues in the Kalispell area." In an August 31, 2020 email, Northwest's counsel expressed to Cincinnati that Desjarlais's updated  complaint   demonstrates  that  property  owners  are

"combining forces to pursue legal action".

24.     Desjarlais hired a local company, Pioneer Painting, to inspect her property.   Pioneer Painting's report concluded that Northwest improperly applied the paint to the siding.   Pioneer Painting found that the finish on Desjarlais's home appeared to be "at least 15 years old" and was "shocked" to discover that the siding was finished and installed only 5 years prior. Pioneer Painting observed that a "good coating was never applied properly or thick enough", the "[l]ower edges appear to be allowing water to intrude into the siding", the end gaps between the boards were too wide which has caused the center clips to fall off, and the vertical corner boards were "never properly painted or prefinished" causing the ends of the boards to allow water to intrude from the bottom causing "dramatic swelling".

25.     On October 14, 2020, another property owner in Helena, Montana, Robert Bennett (hereafter "Bennett"), filed a consumer complaint against Northwest with the Montana Department of Justice, Office of Consumer Protection ("OCP").   Bennet attached an offer from Northwest offering him $759.00 as settlement, which would cover the cost of repainting the siding. Bennett refused the offer because he claims his siding has deteriorated to the degree that the only remedy would be to replace and install new siding onto the structure.

26.     Bennett's OCP complaint requests that Northwest issue a full refund for his defective TruGuard Siding,  $3,871.08, plus an additional $3,871.08 for the cost  to hire a contractor to install new siding on his property.

27.     Upon information and belief, none of the property owners have filed a lawsuit against Northwest or Collins for the Property-Owner Claims.

**C.   Northwest's Demands that Cincinnati Indemnify and Defend the Property-Owner Claims.**

28.     After Northwest gave notice of its "potential" claim on June 26, 2018, Northwest did not initially follow up and provide Cincinnati with any documentation or information.   Cincinnati reached out to Fred on several occasions requesting updates and further information.   Fred would either not respond to Cincinnati or responded stating that Northwest had no update on the "potential" claim.

29.     In December 2019, Cincinnati contacted Northwest's insurance broker, PayneWest, which informed Cincinnati that some property owners had submitted consumer complaints with Northwest.  However, Cincinnati still had not received any documentation or further information about these claims from Northwest.

30.     In January 2020, Cincinnati sent Northwest a final request for documentation and advised that, if Northwest failed to respond, Cincinnati would close the claim.

31.     After Cincinnati provided Northwest its final request for documentation, Northwest began producing documentation and information about the scope and nature of the Property-Owner Claims.

32.     On June 14, 2020, Cincinnati sent Northwest a letter denying coverage on the grounds that the Property-Owner Claims fall under "your work" and "your products" exclusions.

---

**Complaint for Declaratory Judgment**                                                                    **14**

33.    On June 29, 2020, Northwest's counsel responded in a letter demanding that "Cincinnati reverse the declination and promptly cover the claim."   Northwest also threatened Cincinnati with claims of bad faith.

34.    On July 27, 2020, Northwest's counsel sent another letter demanding that Cincinnati provide coverage for the Property-Owner Claims.

35.    On July 31, 2020, Cincinnati's coverage counsel, Meaghan Schneider, sent a second letter further detailing Cincinnati's reasoning for denying coverage.

36.    On August 14, 2020, Northwest's counsel sent a third letter, again demanding that Cincinnati provide coverage for the Property-Owner Claims and that Cincinnati  indemnify Northwest.  Northwest acknowledged that "there is no pending lawsuit against Northwest" and that "Northwest's claim is really one for indemnification."   Northwest's counsel demanded that Cincinnati indemnify Northwest because "Northwest is not obligated to sit around and wait for a lawsuit to be filed before addressing a customer complaint."

37.    On November 2, 2020, Northwest's counsel sent Bennett's OCP complaint, described in paragraph 25, above, to Cincinnati and requested that Cincinnati provide a defense to Bennett's OCP complaint.

38.    Although Bennett's OCP complaint against Northwest does not trigger Cincinnati's duty to defend, Northwest's demand for defense of the OCP complaint is yet another example of Northwest's clear demands for indemnification and defense, which further demonstrate the current and live dispute between the parties over the scope of the Policy's coverage.

## COUNT I

### *Declaratory Judgment (28 U.S.C. § 2201 et seq.)*

39.    Cincinnati incorporates by reference paragraphs 1-38, above, as if set forth herein, and further states and alleges as follows:

40.    Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and obligations of the parties under the Policy on the grounds that an actual controversy exists.

41.    An actual and real controversy exists herein between Northwest and Cincinnati as to whether the Policy provides coverage for the Property-Owner Claims asserted against Northwest.  Cincinnati has communicated to Northwest on multiple occasions that the Property-Owner Claims are not covered, or even potentially covered, under the Policy.  Northwest has demanded that Cincinnati indemnify it and has threatened Cincinnati with bad faith claims.  Northwest has also demanded that Cincinnati defend Northwest for Bennett's OCP complaint and for any future lawsuit filed by a property owner against Northwest.

42.    Based upon the nature of the Property-Owner Claims and the information provided by Northwest since its notice of claim, Cincinnati has no duty to indemnify or defend Northwest under the Policy because the Property-Owner Claims are not for "property damage" arising from an "occurrence" as defined under the Policy.

43.    The Property-Owner Claims allege that the defective siding must be repaired or replaced because Northwest's completed work was incorrectly performed on the siding, which is excluded from coverage under the Policy's

"your work" exclusion (Exclusion l, above).

44.   The Property-Owner Claims also arise from defects in Northwest's product, TruGuard Siding, and, thus, are also excluded from coverage under the Policy's "your product" exclusion (Exclusion k, above).

45.   The Property-Owner Claims allege that the property must be restored, repaired or replaced because Northwest's work was incorrectly performed on it, and, thus, are excluded from coverage under the Policy's "property damage" exclusion (Exclusion j(6), above).

46.   The Property-Owner Claims arise from damage to "impaired property" which is excluded from coverage under the "impaired property" exclusion under the Policy (Exclusion m, above).

47.   The damages sought in the Property-Owner Claims arise from the recall of Northwest's products, "your product", "your work or "impaired property" which are all excluded from coverage under the Policy "recall of products" exclusion (Exclusion n, above).

48.   Northwest may not seek indemnification from Cincinnati for the settlements it has paid or entered into regarding the Property-Owner Claims in violation of the "no involuntary payment" provision of the Policy.

49.   Cincinnati has no duty to defend Bennett's OCP complaint against Northwest because this complaint is not a "suit" under the Policy, and Northwest is not entitled to coverage for this complaint for the reasons stated in paragraphs 42-47, above.

50.   To the extent that any other term, provision, or exclusion of the Policy precludes coverage of the claims and damages in the underlying

Property-Owner Claims, Cincinnati incorporates those terms, provisions, and exclusions here.

51.    In the alternative, Northwest alleges that the Property-Owner Claims are based upon Collins's, not Northwest's, negligence and/or defective product.  If  true, Northwest would not be entitled to indemnification or defense under the Policy because the Property-Owner Claims would be against Collins, not Northwest.  *See Northland Casualty Co. v. Mulroy*, 357 F.Supp.3d 1045, 1051 (D. Mont. 2019).

52.    Accordingly, pursuant to 28 U.S.C. § 2201, Cincinnati seeks a declaration from the Court that it has no duty to indemnify Northwest for any of the Property-Owner Claims or defend Northwest in any future lawsuit or any consumer complaint filed with OCP concerning the Property-Owner Claims against Northwest.

## PRAYER FOR RELIEF

WHEREFORE, Cincinnati prays for judgment in its favor and against Northwest as follows:

a.    For a declaratory judgment that Cincinnati has no obligation to indemnify Northwest for the damages sought in the Property-Owner Claims for the allegedly defective siding;

b.    For a declaratory judgment that Cincinnati has no obligation to defend Northwest for any complaint filed concerning the Property-Owner Claims;

c.    For a declaratory judgment that Cincinnati has no obligation to reimburse or indemnify Northwest for the settlements Northwest paid

or entered into regarding the Property-Owner Claims;

d.      For a declaratory judgment that Cincinnati has no duty to defend the consumer complaint filed by Robert Bennett against Northwest with the Montana Department of Justice, Office for Consumer Protection.

e.      For an award of all costs, expenses and attorney fees that Cincinnati has incurred; and

f.      For such other and further relief as the Court deems just and proper.


DATED this 4th day of December,  2020.

<div style="margin-left:40%">

BEAL LAW FIRM, PLLC
Attorneys for The Cincinnati Insurance Company.


By:  /s/ Kristine J. Beal
        Kristine J. Beal



By:  /s/ Ian P. Gillespie
        Ian P. Gillespie

</div>